I'm here on behalf of Julio Cesar Ruiz, and I'd like to reserve 2 minutes for rebuttal, and I'd like to take my 10 minutes, and Mr. Garland will take his 10 minutes. No, 20 minutes per side. Yes. Okay, so 10 minutes. For myself. So you're taking 10 minutes, he's taking 10 minutes. Correct. And you're reserving 2 of your 10 minutes. For rebuttal, Your Honor. There you go. Okay. Thank you. There are 4 issues that we argued on behalf of Mr. Ruiz. I would like to concentrate my time on the first 2, the escape issue and the drug quantity issue. I'd like to concentrate the majority of my time on the escape issue and the drug quantity issue, unless the Court obviously has any questions about the other 2 issues. And a counselor would help me if you would keep your voice up. Yes. The escape presented an interesting question, and apparently from everyone's study of the issue, the first-time issue, regarding the participation of the deputy sheriff who was not part of the joint task force, but was actually a person who heard about the arrest and came to assist. So the point, he was acquitted on the escape, or the escape charge was dismissed. That's correct. Okay. So your argument, then, is going to be sort of the enhancement, obstruction of justice predicated upon the escape? That's what you're arguing? That is, Your Honor. Actually, I argued it in the alternative. My first issue was that since the Court had found that there was no legal basis to maintain that charge because of the deputy sheriff being just. A federal officer. Correct. So that was kind of a technicality. That's correct. If the officer had been a federal officer, the escape charge could have been brought. But because it was charged as escape from a federal officer, the elements were not met for that charge. That's correct, Your Honor. But you're not saying, though, that the Court couldn't consider the attempted escape as part of the obstruction of justice? Well, I was maintaining that argument, Your Honor. Okay. My problem with it is, as I thought about it, is that if it's legally insufficient, then my question was, how can the Court then, what can the Court actually do with it? It's not really like anything. Can it be a relevant factor? My position is it cannot be. And obviously, it's a very unique kind of an issue. And in searching for support, direct support, I could not find anything. What's your closest analogous authority? I would suppose that there clearly is an argument that it could be relevant conduct. But when I thought about how the guidelines, at least at that time, treated acquitted conduct, I thought, well, there's possibly room there. But now we have Booker, and our position is that at least under Booker, the Court has to consider all these factors. And I think this factor clearly tilts the situation. It makes it a very different kind of a consideration. Would you agree that if we were to order a limited amyline remand, that all of these factors then would be available to the district court to consider in deciding whether or not it would have given a different sentence? I would, Your Honor. And, I mean, in all candor, I think that's what has to happen here. Is that the case? We recognize, however, that in reconsidering, the sentence could be higher. It could be, well, Judge Ishii gave Mr. Ruiz the upward adjustment. So, and it could be that the Court could find that there were additional aggregating factors. And that's always the risk that we may run. But I believe, though, that it does, the proper court is for it to go back to Judge Ishii on a limited remand under amyline for consideration. And your client would know that he might get a higher sentence. Well, that is always part of the risk, I think. And my other issue is as to the drug quantity. And the government's argument was that we did not have plain error. But I think we clearly have plain error. The case went to trial. The evidence was presented. We had a chemist who testified with great specificity because there were a lot of containers with various amounts, various grams of methamphetamine and methamphetamine in different states of preparation. And all that information came before the jury. But, of course, the problem is that at that point, we correctly followed the law. The law has changed. Right. And so we have to send it back because the judge made the finding of the amount over and above the minimum amount to trigger the average. That's correct. And that is our position on these issues, unless the Court has any further questions. Are you going to argue about the firearms charge? If the Court wants me to, I will. How have you split it with your co-counsel? We split our argument ten minutes for each of us. Did one of you plan to address the firearms charge? We have not. We didn't split it that way. I think that's probably your strongest argument. I'm not speaking for anyone else, but I would really be interested in hearing you. Okay. All right. And in that case, I'll reserve the balance of my time. Thank you. Good morning, Your Honors. My name is John Garland, and I represent Angel Eleazar Noriega Valenzuela. That is his true name. We had some problems with his name at the beginning. What's his true name? It's Angel Eleazar Noriega Valenzuela. Was he tried under the name of Andres? Andres Ramirez Noriega. However, both names were used within the trial. And I'll refer to him as Mr. Noriega. Okay. Your Honors, with respect, there's three issues that Mr. Noriega raises, the first being sufficiency of the evidence with respect to the firearms that were located in the detached garage. The jury was asked to find, was properly instructed on the elements of 924C and was asked to find specifically which firearms they determined were involved in the drug trafficking offense. Used in furtherance up. Used in furtherance up. Yes. Yes, Your Honor. There were firearms located in a loft, which was built above the actual garage. There were firearms found in the stairwell to that loft, and there were a single firearm found in a sofa that was in the main area of the garage. Counsel, let me ask you this. Does there first have to be possession of those firearms before that enhancement for use can be found, or? I have found no case that indicates that actual possession is required. However, in this case, there was no actual possession, evidence of actual possession by any of the co-dependents, including Mr. Noriega. Are you conceding then that you can have use of a firearm without possession of a firearm? Absolutely not. Okay, then I can go back to my question. Does there have to be possession of the firearm before there can be a use of a firearm enhancement? Yes. Okay. But you haven't found a case that says that? Not in this case, Your Honor. Okay. This is one of those cases where I had a great deal of trouble. I've had a 924C case before, this court before, many years ago. And in that case, it was under the old law where the gun was in the trunk and there was no connection that the gun was actually related to the drug offense. That was Mann. That was the Mann case where it was in a locked compartment in a truck. Yes. But what about Krause? In Krause, they found firearms in the area where the drugs were being used or were being stored. Isn't that what we found here? What was found here, Your Honor, is guns that were basically hidden, except for in the loft. In the loft, there was a .38 caliber semi-automatic pistol loaded on a couch near where one or more persons could be watching the TV monitors on the video cameras which would alert the occupants of the onset of federal agents. And there was some evidence that the defendants were escaping, indicating that they'd been watching the cameras, and I believe Noriega himself said he had been in the house all day watching the cameras. That reference was made by the government in their brief, and what actually he said to the officers was that he was watching TV all day. He did not indicate that he was in the garage watching TV. He was also a house associate. Would a reasonable trial fact under Rule 29 motion be able to conclude that the TV he was watching was upstairs in the loft? I think so. Because there was no evidence to the contrary, a reasonable jury may have been able to find that. But there is no indication as to when he was in the loft watching the TV and when that firearm was in open view. It was in open view when the agents arrived there, right? That's correct. As well as a .40-caliber Smith & Wesson, which was loaded in the loft. I believe the weapon... And a .45 Colt, which was under the pillow in the couch in the garage, right? Step two, these people were all found guilty of conspiracy to manufacture, possess and manufacture methamphetamine, and they do not appeal that conviction in the conspiracy, correct? No, they do not. So why isn't the possession of a gun by any one of them vicariously attributable to all of them? Your Honor, under Pinkerton, the Supreme Court held that in order for the non-offending persons involved in a substantive offense to be found guilty under the conspiracy theory, they have to have knowledge or it must be reasonably foreseeable to that person that someone is going to possess a firearm during this drug trafficking offense. Isn't it reasonably foreseeable to a person who's up in the loft and sees two guns there and they're watching the videos of approaching agents, isn't it reasonably foreseeable the guns are there not for target practice but for the purpose of perhaps repelling invaders? If there was actual evidence that my client, Mr. Noriega, was up in the loft when the gun was out in the open. There was evidence that he was watching TV all day and he was escaping from the house when he was caught. It's all due respect, Your Honor. If we accept the proposition that he was watching TV the entire time, then he would not have had pseudoephedrine stains on his hands, on his face, and on his clothing. So the government argued that he was actively involved in the pseudoephedrine extraction process which is going on down below. Well, that's not before us because you don't appeal the underlying conviction. Well, I don't think we can argue that the fact that an officer testified that he said, that Noriega said to him in a post-arrest statement that he was watching TV all day. He didn't say, I was upstairs in the loft. He said, I was watching TV all day, which is obviously a self-serving statement by a young man who was arrested. But to say that that was sufficient evidence to prove that he actually saw the firearm that was in the loft, that was out in the open at the time the officers arrived, that doesn't mean that it was out in the open if he ever was in that loft for him to see. It's very possible, again it's not in the record, that no one was in the loft at the time the officers arrived. However, due to the fact that everybody started running before the officers actually got into the gate, they were out at the gate to enter into the driveway area. When everybody started running, it was before they actually entered. So it's reasonable, I guess, to assume that somebody was monitoring those televisions and said the police are coming. However, nobody grabbed any of the guns that were hidden supposedly in places that would be easily available to defend that loft. At least they didn't grab these three guns. We don't know if there were others that were otherwise disposed of. Let me ask you this. In United States v. Crouse at page 968, we said, a conviction for possession of a firearm in furtherance of a drug trafficking offense or crime of violence under 924c requires proof that the defendant possessed the weapon to promote or facilitate the underlying crime. Would you agree that that incorporates a possession element? I would certainly agree to that, Your Honor. And there is no actual possession by Mr. Noriega. And I am arguing that there is no constructive possession by him because he has to have knowledge, first of all. Was there any evidence that he had knowledge that a gun was there? The only knowledge is what Judge Vega has referred to as him saying that he was watching TV. There was no evidence at all that he was in possession of a firearm or that he even knew that they existed. Tell us my question. And in order to have constructive possession, you not only have to have knowledge, but you have to have the ability to exercise control over that. In other words, he would have had to have been able to get that gun and use it if he chose to do so. And my argument to the jury focused exactly on that. And the gun was sitting on the prosecutor's table, and I physically showed them that it is not possible, based on the evidence that was presented, to assume that he had constructive possession. One of the other people, co-defendants, may have had constructive possession, but not Mr. Noriega. Did anyone plead guilty to possession of a weapon in furtherance of a drug? No. It's my recollection that as a part of the plea bargains, they were allowed to plead guilty to the conspiracy only, and then they received the two-point enhancement under the guidelines for a firearm being present. But no one pled guilty to a 924-C. That's Diaz. Diaz pled guilty and was given two charges. Diaz pled guilty and Mr.  to the conspiracy, and then the firearm was added with the two-point enhancement under the guidelines. But no one pled guilty, to my recollection, of a 924-C. With respect to the other issue, on the book of remedial holding, I think my case with Mr. Noriega is very clear that the judge was troubled by the fact that he was a young man who had never been in trouble before, and he was looking at a 235-month sentence on the conspiracy alone, count one. Knowing that the sentence on the 924-C was a mandatory 60-sentence that had to be consecutive, he had a very high sentence that he was facing. I filed a sentencing memorandum on Mr. Noriega's behalf and argued that... The judge didn't actually go so far as to say that I would impose a different sentence, but for the fact that the guidelines are mandatory. He did say there are some considerations here that are troubling. One is your age and the fact that you had no reported prior criminal history or record. And he went on to say, as the government has pointed out, that those in and of themselves taken together are not determining factors as to whether or not I will or will not allow a mitigating role finding in this case. That is at the reporter's transcript for sentencing at pages 7 and 8. Was he eligible for a safety valve adjustment? He couldn't have been because he went to trial and he did not submit himself to debriefing. In addition, he would not have been eligible because of the presence of firearms in the garage, even if the government had stipulated that he was not in possession of the firearms. For that purpose, he may not have been eligible had he wanted to do that. But I believe the court stating that he was troubled by those factors, which were two of the factors I raised in requesting a mitigating role, the court properly analyzed that request in saying that those two in and of themselves at that time, when the guidelines were mandatory, those weren't factors that could be considered. We understand your argument, counsel. We'll hear from the government and then we'll give you a few minutes for rebuttal. Good morning. Good morning. I'd like to go a little bit out of order and just get how she can take care of this without the firearms. The government agrees that a limited amyline remand would be appropriate in this case. I don't think there's any dispute about that. With that taken care of, turning to the firearms, the first thing I noted, I got the indictment and looked at it. I wasn't trial counsel. The charge is possession in furtherance of a conspiracy. So you would agree that there has to be a showing of possession? Right. Right. There has to be a showing of possession. And then the government's theory was always the Pinkerton liability. So turning the standard of review. Let me just ask you about that. Under the Pinkerton theory, somebody still has to possess the weapons, right? Certainly. Okay. In this case, who possessed the weapons to provide the Pinkerton link to the other co-conspirators? I think this leads to an interesting theoretical question, which I haven't considered other than standing right here. I don't think theoretically. I'm talking about factually. Factually. And the answer is, does the government have to prove which one of these people possessed it? The government just said someone possessed the weapon. The government did not identify. To be fair, the indictment lists five people and says that they possessed it. That's a problem for me. Tell me your best case authority for the proposition that the government can make a global allegation of possession and that's sufficient to sustain a conviction under a Pinkerton theory. I'm sorry. I can't tell you my best case authority. I can't even tell you any case authority for that because it hasn't been raised in the briefs. But it's raised in my mind. And we will certainly be researching that and letting the court know. I cannot stand here and tell you that. Tell me how you sustain the conviction then. What authorities, what case authority sustains this conviction then? The case authority, one, we look at the standard of review, of course. Could any rational jury find it? And then we've got these individuals that were linked to the garage and to the loft, and obviously there's weapons here, there, and everywhere. There's weapons right in plain view on a couch tucked in apparently between the support of the couch and the seating area. But at what point in time? The question becomes were the weapons there at the same time as any or all of the defendants? I think there's a real serious issue of proof. Well, certainly the weapons were there when the defendants ran out. The police arrive at the gate. Somebody is apparently watching the surveillance cameras because there's no other windows. The men run out the back door of the garage, back door, side door. And then nobody else comes in. The people that ran out were there. The police searched. The weapons were there. So when those men were in the garage, they were there with the weapons. There's no way we can construe these facts that somebody else snuck in and put the weapons there after those men ran out but before the police found them. That's not our facts. That's enough to prove possession in your view? Let me go on. We've got apparently one of those four. And the likely candidate is Mr. Noriega because he says he's been watching TV. It has been up in that loft with a firearm out in plain view on the couch, watching the monitors and warning the other people. What's the evidence that the firearm was out in plain view of the couch at the time Mr. Noriega was there? The evidence is that's where the officer found it when he went in. What's the evidence that Mr. Noriega was there when the officers came up the driveway? At the same time that the weapon was there in plain view. Okay. It's the same circumstantial evidence. The men run out of the garage. The officers go in. There's the gun. So the gun was where the police found it is where it was when the men left. I think that's a very, very rational way to interpret the facts.  So to answer or not answer the court's question, there's four men in the garage. Somebody's up in the loft. The gun's out in plain view. They all leave. One of them is in actual possession of that gun. And the government's theory, of course, would be all of them are in constructive possession of the guns that are scattered all throughout this garage. I don't mean to overstate it. The government's argument is that it need not prove which of the individuals was in charge of the gun as long as there can be an inference that one of them was. That is – and because this is a new issue, that is what it appears to me now. Why is that a new issue? Because it has not been raised in the briefing we've done. How did the government – I mean, I don't understand why you think this is a new issue because the government always had to prove possession in order to have the 924C charge proved. So I don't understand why that's a new issue. I'm just asking you how did the government prove the possession? The government obviously put on the evidence it was, and somebody – it's very clear. Somebody was up in that loft and was in actual possession. Some of those – one of these four defendants, five defendants that were named in the indictment. That's what bothers me, too, is it's sort of a race epilopeter theory that somebody – it speaks for itself. If you can't identify that some person, one of the conspirators, committed the crime of possession, how can you charge a co-conspirator if you can't identify it? Well, I don't think that that's that unusual in the conspiracy context. Do you have a case that shows it's not that unusual? As you say, somebody did it? Well, let me just – I don't have a case in my fingertips, but to put it this way, if there's an act done in furtherance of the conspiracy, all the conspirators are responsible. Exactly, but the actor is identified. Right. The actor is identified. That's the missing piece we have here. Suppose we have a conspiracy because the conspiracies are ordinarily alleged, and that's A and B and other persons known and unknown to the grand jury. And I'm just throwing this out as a hypothetical that's come to me as I'm standing here. It's very clear in the conspiracy that A and B have conspired to have some other person killed, John Doe. And then in the exact same way, let's say the authorities have a wiretap, and A and B are saying, let's have John Doe killed, let's have somebody machine gun him, and the police, to their horror, can't get a hold of John Doe right away, and somebody machine guns John Doe. And A and B have an alibi, an ironclad alibi. They're in court when this happens. Nobody knows who killed John Doe. Certainly A and B would have conspirator liability for that homicide, and we would have no idea who did it. Counsel, may I ask you a question here? Is it your theory that because both Ruiz and Noriega had keys to the building, they had possession of everything that was in the building? Yes. That is one of our theories. Okay. What case authority supports the proposition that anyone who has keys to a building constructively possesses everything in that building? I can't believe there's a case that says that. Well, whoever you are here, and I'm going to- But do you have a case that says that? No, you do not have a case that says that in my opinion. What we've got is, these men are in the building at the same time there's a drug lab, at the same time there's weapons. Somebody, it seems pretty clear, is up in the room where the one weapon's out in plain view, and they all run away. We get to, for Mr. Noriega, there's actual knowledge, I think. There's very much, these facts will support actual knowledge that he was there. Now, my best cases on this is the Henson case, where this person didn't have a gun himself, but one of the co-conspirators did it, and because of the reasonable possibility- If there's proof that one of the co-conspirators actually possessed the gun, then it's a slam dunk, but we don't have that here. Well, I think we've got a slam dunk, Your Honor, that one of the co-conspirators had the gun. We've got a slam dunk that somebody in this conspiracy actually had possession of that weapon that was out, at the very least, the weapon that's out on the couch. That's a slam dunk. We just don't know if it's A, B, C, or D. That's the problem. But we know that it's either A or B or C or D or all of them, and we also know that they're all acting in concert. Do you find any solace in the Krauss case? I'm sorry, Your Honor. If you could familiarize me more with the Krauss case. Krauss was the owner of a house, which found five firearms, ammunition, cocaine, and marijuana. He wasn't found to be holding any of those firearms, but he was found to be in possession in furtherance. I think that would be a great support. Did any of those defendants own the house? I see nothing in the records that that's a question I'm able to anticipate. But there was testimony from Agent Hawk that Enrique Diaz, who pleaded guilty, resided there and was, quote, the individual responsible for the residence. I'm sorry. That's correct. With ER-205-206. Thank you. I think it's very, very common that someone is found guilty of possessing a contraband or a firearm or whatever that's at premises under his or her control, even though they weren't there at the time, or they've entrusted it to a third person. But going back to this, there's A, B, there's four people in the garage. Clearly, one of them had actual possession of that one weapon. And it's reasonably foreseeable that the best case for the defense was your opinion, Judge Nelson, in the Castaneda case where the, I don't know if you recall it. I do not. Okay. A fine case, a fine opinion. There was a woman who was married to a large-scale trafficker. And it was a wiretap case, and she had answered some phone calls, passed on information. I think at one point somebody was, the caller was talking to Ms. Castaneda, the defendant, and her husband had her relay some information. She was indicted and convicted, and the conviction held was affirmed that she had co-conspirator liability. The court reversed it on the 924C aspect, saying it wasn't reasonably foreseeable to her because her involvement in the conspiracy was very minimal. This situation is very different. These people are very actively involved. They're, what am I trying to say, very, very involved, particularly Mr. Reese, who had actually purchased the methanol. One of the witnesses testified that Mr. Reese was paying for it. Mr. Reese was the one bringing it back and forth. My point, I want to say, is this is not a case where it was not reasonably foreseeable to these people. It was reasonably foreseeable to them because they're deeply involved in the methamphetamine transaction. There's a lot of evidence about, a witness testified that guns, firearms are commonly found at meth labs. There was testimony about the value of the illegal property there. The pseudofedrin was going to be able to produce approximately $72,000 worth of methamphetamine. The methamphetamine itself that was there was probably $7,000 worth. It's not a surprise that firearms are there. What about U.S. v. Castaneda? It recognizes a nexus between drugs and firearms, but rejects the presumption of the foreseeability of firearm use in all drug conspiracies. Right, and that was what I was just talking about. I believe that was your opinion. Maybe I misread it. And that's where the wife was very, very tangentially involved, and there was no evidence at all that this wife of the trafficker would anticipate that. This case is completely different. The two defendants were in the garage where there's large-scale meth manufacturing. They're in the premises where there's firearms. It's a completely different situation. It's coming back to me now, and I do have the case in front of me. I just didn't think it was the same. I didn't think it helped you. Oh, I think what I was doing was contrasting Mrs. Castaneda, where the court found it's not reasonably foreseeable to Mrs. Castaneda. Look, she's hardly involved in this at all. She's, at best, a messenger. And in this case, they're all four in the same house. They're all doing it. One guy steps you to Fedrin on them. Okay, I understand your argument. It helps you on the infertile of prong, but it doesn't help you on the possession prong. It helps me, Your Honor, I'm just splitting hairs. It helps me on a reasonable foreseeability. It helps me on the co-conspirator liability. The court has raised this issue of you have to identify which conspirator had the gun. I didn't raise the issue. The law says that you have to prove possession before you can have a 924C. Crouch says that. Now, I think the law would be, and we will have a case for you, that if there's a weapon possessed, and it's clearly possessed by a member of the conspiracy, in furtherance of the conspiracy, there's going to be Pinkerton liability. I don't disagree with you, though. The point I'm making is that you haven't shown it was clearly possessed by a member of the conspiracy. Okay, and I guess, maybe I think we have proof that it's possessed by a member of the conspiracy. If we define the conspiracy as the four men that ran out of the garage, and there were other people, but for purposes of this argument, we can just limit the conspiracy to the four men that ran out of the garage. I don't think there's any dispute, but one of those people, if not all of them, possessed those firearms. They were in, if the argument is they were in the garage, but they didn't know, there's two weapons in plain sight in the lot. There's four weapons hidden under a stairway, and there's another weapon under a seat cushion. I think it's, given the standard of review that any reasonable jury could find, I think certainly anybody could find there was actual knowledge in constructed possession. They're doing a large-scale methamphetamine cook, and they're extracting pseudoephedrine. There was testimony that firearms are commonly found at this, at these locations. Certainly a rational jury could find one or all of them in constructed possession of those firearms. Are you claiming, then, perhaps joint possession by the four? Certainly. I think the evidence would support that. I think the evidence would support that. Therefore, you would have identified some person or persons in possession in answer to Judge Rawlinson. You, in your brief, talked about someone was in possession. Instead, now you're arguing one or all of those four were in possession. And I'm just asking whether you are really saying that they had joint possession, therefore you've identified them, and therefore the co-conservator could be charged. I think I'll dodge that question. I think the evidence supports that. That allows for that. I'm trying. Thank you. I did want to point out the fact that there was no effort whatsoever. And there was testimony to that effect. The only evidence that firearms are commonly found in a drug trafficking case was by one officer who was asked that question specifically, and it was a one-liner. That was it. There was no big discussion about it. The government, in its closing final argument, it must have been at least because it was his house. That is how the government presented it to the jury. And there was never any evidence that any specific individual actually possessed or even constructively possessed it. And, again, I counsel. If Mr. Krause was convicted and this appeal was affirmed, when he was the occupant of the house where they found the five guns, why couldn't Mr. Diaz be found to be in possession? I mean, the main idea being that you possess what you have in your home. That is correct. If he is a conspirator, then his possession by jealousy is a result of his conspiracy. Am I right? I understand what Your Honor is saying, but I don't believe that the evidence that Mr. Diaz was the owner of the property or the resident at the property. The evidence, unobjected to by the defense, and I don't think it's a clear error issue, is that he was, quote, the individual responsible for the residence. And that's what Agent Hoke testified to at ER-205-206. That's correct. And that was the agent's testimony that he... I mean, he pleaded out so he didn't get the possession and furtherance count. That is correct. But that doesn't stop the jury from saying Diaz possessed it under Pinkerton. Diaz possessed it, a co-conspirator. And so did all the co-conspirators. I understand that. That's not, after all, unreasonable, is it? Yeah, but we're using a constructive possession in order to get a Pinkerton, which is even farther removed from constructive possession, saying that somebody possessed it, therefore everybody that's involved with that somebody is responsible. Well, everybody was the key to the premises, which both these gentlemen, Ruiz and Noriega, had. Unfortunately, that evidence came in because Mr. Ruiz and Mr. Noriega went to trial, but I believe everybody had keys. I mean, it might have even brought it up a truth. Yeah. In Krause, there was no dispute regarding possession, who possessed the firearm. Mr. Krause never contested the fact that he had possession. That was pretty much undisputed in the Krause case. That's correct. All right. Thank you to both counsels. The fifth disargument is submitted for decision by the court. The next case on the calendar for argument is Ecklund v. Byron Union School District. We're going to ask everyone to please line up, please. Counsel, please proceed. Okay. Please, the court. Excuse me. My name is Edward White. I'm here on behalf of the plaintiffs. Any arguments I don't get to during oral argument, I'll be relying on my briefs for those. This case requires this court to view the special context of a seventh-grade class where heightened scrutiny is required, and that you must view what occurred in this class dealing with the teaching of Islam through the eyes of an objective observer who's in the place of a seventh-grade student, who's not as informed as your standard objective observer, is more subject to peer pressure, and is more impressionable. This court has to be particularly vigilant in these cases because we're dealing here with children. We're also dealing here with violation of establishment clause in a classroom setting dealing with vulnerable students. The key here is neutrality. And I can't help but wonder if this case dealt with the teaching of Catholicism, for example, and what occurred in the class with Islam had occurred with teaching of Catholicism, that an establishment clause violation would not have been readily found. Here, I believe the evidence shows that the primary effect, whether the defendants intended this effect or not, the primary effect here was advancement or endorsement of Islam, especially when brought into the context of the current policy or the policy that was in place at that time where an instructional goal of the school was to develop the spiritual, moral, and ethical values in students. Here in this Islam unit for the seventh-grade students, which occurred right after 9-11 had taken place, students were passed out information packets. Their grade was based upon participation in this unit. The packet that was handed out to them, which the students kept, said that during this simulation, you and your classmates will become Muslim. They took Islamic names from a listing of names. They made name tags, identification tags, with their new Islamic name. On that identification tag was a star and crescent, which is the symbol of Muslims. They wore those. Again, that was going towards participation and points in the class. In particular, our client, Chase Eklund, wore his on a daily basis. Counsel, won't you concede that many of the elements in this course were secular, that there were disclaimers by Carr and by Carlin, and therefore doesn't it seem more like a secular experience than a religious experience? In the case of the disclaimers, Chase's testimony from his class was that the teacher didn't disclaim a lot of things, did not explain a lot of things. There's also testimony from another student who goes by the initials of EC, who was in a totally separate class from Chase. She does not know what took place in the class. Here, though, if that were the standard, then a school could teach religion, not teach about religion, have the children engage in religious activities, always with the disclaimer of, oh, this is only what Muslims do. However, let's do this. Or this is only what, for example, Catholics do. But let's observe a Lenten fast. Or let's engage in the mass here. However, we're not going to do everything. For example, we're only going to say the first half of the Our Father, or the first half of the Hail Mary. Here, in the context of this class, again, from the eyes of a reasonable observer, you not only have the teachers handing out these materials, and some of these materials, too, have in bold print that says, for example, remember Allah always and you shall prosper. Now, although this is being handed to students and whether the teacher explained it or not, this is still what the students are looking at in a class where they're to become Muslims, in a class also where they're making banners as part of the participation. And on the banners, many of them wrote, in the name of God, the most merciful, the most gracious, praise be to God, and had those banners displayed on the wall. Again, if you put this in a situation of teaching Judaism, teaching Christianity, and you are in a classroom with these statements on the wall, of course people are saying you are endorsing religion here. Pardon me, Counsel. Chase, earlier in the school year, didn't the students study a Western medieval culture for a brief time during which Chase assumed the role of a Christian priest? Medieval had to be Catholic. What he did in that phase was he assumed a role just to make, out of cardboard, a little church. He did not have to wear a name tag with the name of a Catholic saint on it and a crucifix with the corpus of Christ on it. So not all Christian priests are saints? No, not all Christian. Just as an aside, everyone who is in heaven is a saint, but then you have declared saints by the Catholic Church, and not all priests are saints. However, some may think they are. So is it a matter of degree, then, from your perspective? Well, I think in the matter when you're dealing with the espousal clause here, there's no de minimis. It's not like you're only partially pregnant. Well, you were making the distinction between the medieval experience and the Islam experience. So that's why I asked you, is it a matter of degree from your perspective? I think in some respects, yes. When you look at what occurred in the medieval segment, again, they made a cardboard church. They did not engage in all the other practices that were taking place in the Islam section. In the medieval section, they were not told that you will become a Christian. But you said there's no de minimis experience in the establishment clause rubric. So how do you distinguish those two experiences? Because what he was doing in the medieval, building a church, is not engaging in religious practices. He was not pretending to be a priest. He assumed the role of a Christian priest, didn't he, Chase? All he did in that was to build a cardboard cathedral, a cardboard church. He was not blessing people. He was not consecrating wine and bread. He was not hearing confessions. He was not saying part of the Hail Mary. He was not memorizing verses out of the Bible. He was not doing anything. It would be the same as if he were taking the role of a bus driver and made a cardboard bus. He was not engaging in all these activities. Here, they had students engaging in religious practices in the context of this class. They had to, again, make these banners. They put religious statements on the banners, placed them on the wall. They had to recite to their teacher as they left the room, praise be to God, the opening of the satya, which is the equivalent of the Lord's Prayer. I mean, all these activities are crossing the line. It's one thing to teach about religion. No one has a quarrel with that. But here, you are having these children now engaging in activities, which have clearly gone beyond the point of just teaching about a subject into more of a trainee in the subject. Why doesn't Brown control our analysis? In Brown, Your Honor, that's the Brown versus, I think it's Woodland case. In that case, I was dealing with a series of books. There were 59 books in total, 10,000 literary selections. Out of that, the plaintiffs have pointed to a handful of passages or selections dealing with witchcraft. The court, this court, said that those were just fantasy activities. They did not have any direct relationship to actual witchcraft practices. They were just merely coincidental in that regard. So you have a wholly separate situation from just fantasy activities based upon a secular material, compared to activities here that are based upon a book that is sectarian in nature. And it's going to your question earlier, Judge Nelson. If the teachers had to qualify and clarify this book so many times, as the defendant said occurred, then that underscores the fact that it's not wholly a secular book. It's a sectarian book, and it just emphasizes the religious nature of the book. Again, you have a statement in the book in big letters, remember Allah always and you may prosper. At the same time, children, seventh grade children, are wearing identification tags with their name, which again, a reasonable person would know that in Western society, when someone converts to Islam, they change their name. Cassius Clay, Muhammad Ali, Lu Alcindor. Counselor, let me ask you this. In Brown, the selections require the children to role-play forerunners in witches and to cast spells. How is that different? Because what the Brown court found was that those were not truly derived from the religion of witchcraft, which was the assumption in that case. They were based upon many different natural views, I believe the court said. There were different folklore that the authors had drawn from. They acted out religious activities in Brown. Well, this court said they were just fantasy activities. They're not truly religious activities. The fact that they were merely consistent with or resembled the religious practice does not have the primary effect of advancing religion. That's what we said. But in our case, they're the explicit application to the classroom of these religious activities. In this case, the children were reading the actual Fatiha, which is the prayer. We're memorizing parts of it and reciting it to the teacher. We're reading actual from the Koran, memorizing parts of it, and reciting it. We're giving quiz cards that had affirmations of Islamic truth. For example, and I'm just paraphrasing here, that the angel Gabriel came to Muhammad, said he was the apostle of God, and would go warn his people. Truth. These are affirmations, positive affirmations. Worship service. You're not continuing that worship service. No, but that is indoctrinating, inculcating students. It's one thing if... Excuse me, counsel. I don't understand what you're saying. Are you saying that our children should not be taught the history of all the religions of the world? Would that fall within your definition of impermissible classroom activity? And isn't this basically, with the millions of Muslims in the world, we're teaching the children what they believe and what they think about, when the teachers say this is what they believe, and they're always referring to those who follow Muhammad and those who believe in Islam in the historical context. Otherwise, you would deny our children the history of the world and all the great religions of the world. Is that what you're saying? No, not at all, Your Honor. I earlier said that no one in his right mind has a qualm about teaching children about religion. The teaching about religion, in this case with Islam, out of the state-adopted and approved book across the centuries, explains thoroughly Islam. It puts everything into qualifying terms. In our particular case, the students were to take on the persona of a person who believed in Islam. To make the history lesson come alive. But you have... Then in that case, then, okay, if what occurred in the Islam unit here should then be permitted, and if this court is going to affirm what happened below, then it should make it clear that any religion, no matter what it is, can be taught identically to what happened in Bahrain School District. Do you have any case where we have prohibited similar things with respect to Christianity or Judaism or Islam or Hinduism or Buddhism or Zoroastrianism? Are there any cases that say that teachers can't do this? The only case that, again, these don't come up that often. The only cases were dealing with the simulation or dealing with the witchcraft that said it was permissible but then said it was a fantasy activity. The most prominent one is just the under God. Saying under God in the Pledge of Allegiance is foreboding, which this court has said. Other circuits, for example... That case has been vacated. Well, on that regard, the district judge who is now hearing the case now says that it had been vacated but on separate grounds, therefore, it was still controlling him. Again, that's just the most recent opinion I read on that, Your Honor, whether that's true or not. That was not an opinion of this court. No, that was an opinion of a court bound by a Ninth Circuit precedent just within the past month or so. Yes, it was a Ninth Circuit precedent. No, no. What I was just saying, Your Honor, is that my aside here was just in response to the judge's question that at least one district court recently in California still viewed himself as bound by it. But that's a side issue. My case question to you was was there an opinion of this court that would prohibit similar scenarios vis-à-vis any religion? Not from this court. Again, the only decisions dealing with any type of activity that I can recall would be, again, the Brown decision, which you pointed to, but that, again, was dealing with secular activity. Now, in that Brown decision, it did say, and as a warning... Well, look at that. The coven and the witches don't think it's secular. They think it's religious, don't they? Well, this court in the Brown decision just worked under the assumption that it was religious. However, it said that the activities just resembled witchcraft, were not the... So you draw the distinction between if it's fantasy, if it isn't a true and faithful representation of the religion, Brown, it's okay. But if it's a true and accurate and faithful representation of Islam, it's not okay. No, if it's a true and accurate representation of a actual religion where students, as in this case, are engaging these activities, putting up banners praising God or Allah, I think that in that case, now, you have moved beyond the teaching of into the teaching about into the teaching of. You call that worshiping? I would think in the context of this class, it would be. Again, you have to look at this in the context of the seventh grade students, banners on the wall, praising Allah, okay, praising God, going up to the teacher, making the same statement, praise be to God, most merciful, most kind, praise be to God, wearing the name tags with the religious symbols throughout the materials, having affirmations in the materials to remember Allah always and you shall prosper, all in this course when in no other course did they engage in the same activities. Did any of the students express that they felt they were worshiping? I think in Chase's testimony was that when he began, again, this is the words of a 12-year-old, began feeling weird, is because they actually were doing it and practicing it. Did he feel that he was actually engaging in a worship service, Islamic? He thought that from his testimony, if I recall correctly, that he was practicing it and actually doing it. Where's that language in the record where he said he felt he was practicing Islam? I'll find that for you. One second, Your Honor. Perhaps you might want to do a little rebuttal. I will. I don't want to wait. I will point that out to you, Your Honor. It is in the brief with the record excerpt sites. All right. What did he say? Muslims say Allahu Akbar, which means God is victorious. That's what Muslims say. Is that worshiping? No. It depends on the context. I think if they would make that statement in the context of here acting as though they're Muslim in a classroom where they're getting points for participation and where they're engaging in all these activities, it is now one other piece of the puzzle of an establishment clause violation. He said, I want you to repeat after me what Muslims say. And they repeat Allahu Akbar. Is that worshiping? Probably not, if it's a one-shot deal. What she's doing here? She's doing it continually. She's doing it continually. She's doing it with children who, again, from their perspective, for points, are to become Muslim. That's what the handouts said. They are doing it with catechetical, for lack of a better term, materials that have everything laid out as truths, which even if the teacher clarified it, they still have the materials for students to look at. How is it different from the fantasy in Brown, though? I don't understand how you make a distinction for Brown where they were role-playing as opposed to in this case where they're role-playing. Because in Brown, the fantasy activities were based upon a secular source. I'll just say, I've noticed, practitioners of that art don't think it's secular. But we don't know exactly from at least my reading of Brown, and I'm sure if I'm wrong, please correct me, exactly what these spells were. I mean, I don't know, are they the wording used that a witch would use? We would assume it was a religious ritual. We assume that. No, the court said that Wicca was a religion, but not that these spells, et cetera, were a religious ritual. What the court then said was that engaging in such activity may have a higher risk of violating the Establishment Clause. And then in a footnote, Indicta said, however, it may be allowed sometime. And it gave an example of, I believe it was a Native American dance, and then maybe I think it was the Last Supper, as a one-shot deal for a religious purpose. Not over the course of several weeks. But my reading of Brown was just that Wicca was assumed to be a religion, but not the actual practice. Here, these practices are not fantasy practices. They're explicit adaptations for the purpose of a classroom. Now, they're not 100% accurate just because you can't do that. You can't, you know, fasting for Ramadan is a month-long experience, or praying five times a day, et cetera. I mean, this is designed to acquaint the students with these practices. And I think this is not saying you can't teach it because the book itself allows it, the Across the Centuries book, which also warns against what happened in the classroom. This is a state-approved book that says you shouldn't be engaging in these activities. It can still be taught, kids can still learn, just as they learned other religions in the class, Christianity and Buddhism, for example, without engaging in all these activities. I'm willing to ask some more questions when my time has run. All right, thank you. Good afternoon. May it please the Court. Linda Lye for Defendants Byron Union School District and the other school defendants. At issue in this case is the critical ability of public school educators to teach students about different cultures and religions, including the religion of Islam, a function that takes on increasing importance in today's global world. Also at issue in this case is the critical ability of public school educators to use effective instructional strategies in teaching their students about diverse cultures and religions. In asking this Court to reverse Judge Hamilton's well-reasoned, careful opinion, plaintiffs are really asking you to depart from well-settled controlling precedent and well-established legal principles. I'd like to address each of their claims in turn, starting with the Establishment Clause, the hardest of case. The simulation to which plaintiffs object consisted of a game, an educational, fun classroom game, with camels moving along a classroom board wall. Students made art projects, they colored pictures of camels and palm trees, they answered trivial pursuit-type questions, and they filled in a map of the Arabian Peninsula. Counsel, what about opposing counsel's representation that there were banners around the wall surrounding the class that had attributions from the Koran? It is clear that from the context of the classroom, the context of the activities, there was nothing sacred or worshipful about any of the activities that the children participated in. For instance, the banner activity that he's referring to. This was a banner on butcher paper. The children were divided into groups. They made a banner for each city, so Jerusalem, various historical cities from the Middle East. They colored pictures of camels, and they could put words on them. Some children, some of the students decided to write the word bismillah on it. But in the context of this overall learning activity, the banner was a way of helping them, an art project to help them learn that in the religion of Islam, one of the activities that Muslims believe they are supposed to do is to profess their faith. Now, if you look at what the activity was, there was nothing sacred or worshipful about an art project that would have made the students think that Ms. Carlin was somehow encouraging them, the students, to profess their own faith. Rather, this was one activity presented in a secular context of learning about Islamic history, culture, and religion. And so the students were simply doing an art project to learn that one of the things that Muslims do as part of their faith is profess their faith. Let me ask you a question about the fact that the focus was on Islam and not on other religious activity. Does this raise any First Amendment concerns? That no other religion, in other words, the focus of this teacher was on Islam as a unit. The fact that there wasn't a unit on various other religions, does this pose any First Amendment concerns? Well, it's not true as a factual matter. The record is not consistent with the assertion that the only emphasis was on Islam. Other than the witchcraft religion, was there a focus at any time on? Yes, the students studied in the unit on Islam. This is exactly the problem, the analytical problem with Plato's argument. They would have this court focus microscopically on a few activities and a few written materials taken completely out of context in which those activities were presented and out of context of the fact that the discrete activities that they emphasized were part of a secular presentation in a unit on Islamic history and culture, which was itself part one unit out of a year-long world history class that studied many cultures and religions, including Buddhism, including Christianity in the Middle Ages. How long did the Islamic program take of a school year? The unit was about eight weeks long. What other eight weeks were devoted to Christianity? I don't remember the precise length of the medieval unit. That was one of the longest units in the world history class. There was an extensive simulation involving the medieval unit where the students role-played, as you pointed out, Judge Baye, different members of feudal society, including the clergy. Chase Eklund himself role-played the position of a priest. The focus was medieval, not Catholic. Well, the focus was medieval society and the role of Christianity in medieval. Did you spend eight weeks on that, dressing as priests and as crusaders? The dressing up occurred for the medieval feast on one occasion. There was a dressing up day. Chase himself was unable to attend because he was ill, but he had planned to go along with the other students to the dress-up festival. They spent several weeks on it. The dress-up day in the Islam unit was one day for the festival presentations, where, as Chase testified, people dressed up as Arabs. There was nothing sacred or worshipful about their dress. They wore bathrobes and pieces of paper. What I'm interested in is whether there was presentation of other religions, Christian, Buddhist, and other religions, animist religions, with an even hand. Absolutely. Part of the argument that plaintiffs seem to be making is that if you use role-playing activities in the Islam unit, there is some kind of discrimination going on because it wasn't being used as much in the other units. I don't believe the record is consistent with that factual assertion because there clearly was this role-play with other units, including not just the medieval unit but also Constantinople, where the students were required to do monuments relating to various aspects of daily life in Constantinople, and student EC did a monument to prayer. Since 1453, Constantinople has been Muslim, right? I believe the historical period in which they were studying it, it was Christian then. But even if it were the case that no other unit related to religion included role-playing activities, the court's conclusion would have to be the same for the following reasons. The students, it is clear from the record and undisputed, were familiar with the use of games and role-playings as common classroom instructional strategies. So they would have perceived nothing unusual, no special endorsement or message of approval from their use in this unit as opposed to other units. Moreover, as I'd like to discuss a little bit more, the nature of the activities was not worshipful or sacred. It was always that the activities themselves were not conducted in any kind of solemn manner. The purpose of the activities, the presentation, was always to learn about Islam, and the activities to which plaintiffs object comprised a very small portion of an overall unit on Islamic history and culture, which was in turn one unit in an overall year-long history class containing a secular presentation on many different world cultures. What's your response to opposing counsel's representation that Chase felt that the class was practicing the religion? A few things. One, the relevant standard is the reasonable observer standard, the reasonable student. That's what this court, Judge O'Scanlan's opinion for this court in the Brown case expressly said. It's the reasonable observer in the position of the student. So one, individual student's testimony is not necessarily relevant. Even though we might agree with you on that, do you agree with the representation that Chase was of the view that he was practicing the religion? Yes, and I think the context is actually quite interesting. If you look at his deposition testimony, he actually said he felt it was kind of weird. I felt weird doing it. I wanted to get the Islam study out of the school because it felt weird doing it after the 9-11 thing. So the objection that he articulated was actually a political objection to the study, including Islam in the course curriculum, after the tragic events of 9-11. It is not only the right... But you say that 9-11 was only a political and not a religious event for people who say that they're performing jihad against the infidels. Well, to the extent that it was a religious objection, it would be inappropriate for the school to excise teaching about Islamic history and culture based on a religious objection. That starts to look very much like what one state did in Epperson, banning the teaching of evolution in response to a religious objection. And the Supreme Court has made clear that, in fact, it would be an establishment clause violation to tailor the public school curriculum just to a political objection. So in answer to Judge Rawlinson's question, you do admit that Chase gave a subjective understanding that he was feeling weird and he was practicing the religion. Chase did testify to that. In addition, we also... What is the phrase, practicing the religion? He did say practicing. I had earmarked the page and then, oh, here it is. What's the edge of the record? It's 2044. He says, the question is, you know, what do you think the suit is about? To get the Islam study out of the school. Why are you trying to get the Islam study out of the school? Because it is violating our right or something. I can't remember. Do you want to get the Islam... And then he says that his mother told him about the suit. So he's asked, do you want to get the Islam study out of the school? Kind of, yeah. Why is that? Because it kind of felt wrong doing it after the 9-11 thing. It kind of felt weird. It's, like, weird. What did he say? He was practicing the religion. And then right after that, what felt weird? Just practicing the Islam stuff and because I'm not so sure. Practicing the Islam stuff, right? The Islam stuff. But when we actually look at the Islam stuff and what happened in the school, I think it's very clear. I would just like to draw the court's attention to one of the examples that the plaintiffs emphasized. The memorization activity. Let's look at what actually happened and, very critically, what did not happen. The memorization activity consisted solely of the following. On one occasion, Chase memorized one proverb with no religious significance whatsoever, kindness will draw a bird, and one line from one Muslim text. He recited it on one occasion by himself as he was, quote, casually walking out the classroom door. What he was not doing was standing in an erect position. He was not reciting in unison with other students. He was not doing it repeatedly. His hands were not clasped. His eyes were not closed. He was not kneeling. He was not bowing. He was not asked to do this in a reverential manner. He was not standing on a prayer rug. He had not engaged in ritual washing. He had not removed his shoes. He was not in a mosque. Judge Rawlinson, you earlier asked, is it a question of degree? And I would say absolutely, yes, it is a question of degree. Was there a sacred, worshipful context to the activity? It's clearly not an Establishment Clause violation for students in a public school context merely to utter words with religious significance. If that were so, then school choirs would never be able to sing a song that had any religious significance. In Bachman, the Tenth Circuit rejected an Establishment Clause challenge to a school choir singing religious songs in religious venues. That's an added level of worshipfulness to the context not present in this case. In the Fifth Circuit's decision in Doe, that court rejected an Establishment Clause challenge to the school choir adopting the theme song, May the Lord Bless You and Keep You. Students in both of these cases were uttering words with undeniable religious significance. But if you look at the context in which it occurred, the activity itself was not worshipful, and there was a secular purpose to sing, to practice their musical qualities, to sing the songs for their artistic, musical values. In this case, there's nothing worshipful or sacred about the context in which any of the activities, including the memorization activity, occurred. Completely unlike the students in Engel, in which the Supreme Court struck down the practice of daily prayer, the students in this case never participated in any activity in which they were asked to solemnly avow their faith in a divine being. Unlike the defendants in McCreary, the recent Supreme Court decision in which the court struck down the Ten Commandments display in the courthouse, Ms. Carlin never urged students to act in prescribed ways as a personal response to authority. All of the classroom activities that the students participated in were entirely secular in nature. They were not conducted in any kind of solemn, worshipful, or sacred manner, and they were always presented for the very express secular purpose of learning about the religion of Islam. Chase himself viewed such classroom games as fun. He and all the other students understood the educational purpose. He recognized and testified that the simulation was just a simulation and that he did not become a Muslim. Mr. White brings up the example of Lent or a Mass. The reason why this case is different is because none of the activities even remotely approached the recreation of an actual religious practice. The activities were not conducted in a worshipful manner. Brown is exactly on point, and the reasoning is entirely applicable to this case. The plaintiffs of Brown were taking the position that merely because there was some connection between the classroom activities and actual Wiccan pagan rituals, that that alone established a violation of the Establishment Clause. This court rejected that argument, relying on the Supreme Court's opinion in McGowan, which upheld against an Establishment Clause challenge, the Maryland Blue Laws prohibiting work on Sundays. The court explained in that case that even though the Blue Laws have their origin in Judeo-Christian prohibitions, their connection between the governmental activity and the religious prohibition is intentional. It's not coincidental. Even though the Maryland Blue Laws have their connection, their origin in the Judeo-Christian prohibition, there's now a secular purpose for them, and that's to ensure that workers don't have to work seven days a week. It's like a maximum hours work regulation in the health and welfare of the public. In this case, exactly the same applies. Just because there's a connection to the religion of Islam, that itself does not give rise to an Establishment Clause violation, because there's a secular purpose, which is to teach students about the religion. And again, as in Brown, the activities comprised a small portion of an overall secular presentation. There was a secular purpose to help students learn about Islam. And so Brown provides a very simple answer to this case. Plaintiffs would have this court, however, do a microscopic analysis, looking at things out of context. Under their approach, it doesn't matter how much the teacher clarifies written materials, how she presents the activities, how secular the overall presentation is, there are some written materials and some instructional strategies that, in their view, are so offensive to their position that they should be per se prescribed. Not only is that position at odds with Establishment Clause case law, it's fundamentally unsound, bad educational policy. As a matter of Establishment Clause case law, the Establishment Clause is simply not susceptible of per se rules. You have to look at the context. If we always ignored the context, then no school would ever be able to include the Bible in any secular presentation on world history. That's clearly at odds with what the Supreme Court has instructed. If we ignore the secular context, no town hall would ever be able to include a crush in its holiday display, no matter how secular the display. We know that is at odds with what the Supreme Court has said in Lynch. Are you going to address Samantha's claim that she opted out? She got a French class. She read the French class. She got flunked. Samantha's claim, I'd be delighted to. The difficulty with their Establishment Clause claim after Samantha Eklund is that they don't – Establishment Clause prohibits the coercion of participation in religious exercises. Nowhere have plaintiffs shown – Wasn't she being retaliated against because she opted out and took French Revolution instead of the Muslim class? She was granted an opt-out because that was what she requested. And the Establishment Clause is only violated if there is a coercion to participate in a religious exercise. Is there any evidence that she got flunked out because she opted out? Absolutely not. She flunked out because she did not complete the class. And, again, the Establishment Clause prohibits the coercion of participation in religious exercises. There was nothing remotely religious about the exercises that Ms. Carr conducted in her class. She had an Arabic alphabet. They studied a glossary. They had a map. They had a trivia game. I mean, there was nothing remotely religious about what happened in the seventh-grade world history class the year that Samantha Eklund took it. So she had no Establishment Clause claim. Again, it's the prohibition of the establishment of religion. It's not just coercion that's at issue. With respect, if I can touch briefly on the free exercise and the due process parental rights claims. For the free exercise, this case is squarely controlled by Grove. There the school provided an opt-out upon objection. Exactly the same was the case here. If the Eklunds had come to us, of course we would have granted them an opt-out. We granted an opt-out to two other students that year. That's all that Grove requires. The plaintiffs would have this court make new law on the free exercise claim. And the due process claim, as this court explained in Hooks, parents simply do not have a right to, quote, pick and choose those aspects of a public school education they want. Not only do they wish to opt their own children out of the Islam unit, they wish to control the public education that is provided to the children of other parents. That goes far beyond their personal free exercise rights and their personal parental rights. No reasonable observer in this case would have understood the school district to have been endorsing Islam in any way. On top of all the various factors which make clear there was no establishment, plaintiffs seem to somehow impute some kind of sham or secret agenda to indoctrinate students in the religion of Islam. I would just note that Ms. Carlin is not Muslim. None of the school officials are Muslim. It would just be bizarre for the school to have a secret, hidden agenda to indoctrinate students in a religion to which they themselves do not subscribe. All right, counsel. Thank you. You have exceeded your time. Rebuttal.  Thank you, Your Honor. With regard to Chase, also on page 2044 spelling to 2045, the question was asked of him during his deposition, so were you upset having to learn about the religion of Islam? Answer, not at first. Then I started to realize that we started studying it and actually doing it. So it kind of like made me feel weird about all of it and stuff. Again, these are the words of a very young boy here. With regard to the worshipfulness, sacredness, for the establishment clause to be violated, it doesn't have to take place in a church. Here it's in the context of a class where children were supposed to become Muslim, were acting as a Muslim would act, and also within a school policy where the instructional goal was to develop the children's spiritual, moral, and ethical values. Our view that we're trying to impose, I mean, Ms. Lye is trying to put more onto what we're trying to do here than really is true, is to not cause any more establishment clause violations. As far as the activities in the classroom, our position is in compliance with Across the Centuries, which is the textbook adopted by the state of California, which says don't engage in role-playing and simulation of religious practices. Also, with regard to the opt-out, an opt-out is useless unless a parent knows about the opt-out. The parents only hear about the opt-out after their child Chase had experienced what he did. And then to show the application of the opt-out, then you see what happens to Samantha, who is opted out because she did not, in light of the policy of the school, and as an effect, she's punished by being ostracized and put off into a room by herself to study when it would have been easier for her to have sat through what her brother did. So an opt-out here, without any notice, is meaningless as far as a pre-exercise clause or parental rights. It's for the parent to opt out, not for the child or for the school. Is there a case that says the opt-out must be publicized, the opt-out option? No, but the cases that I'm aware of and that defendants have pointed to, in particular the Grove case, the students and the family are aware of the opt-out and then either decide to act upon it or not act upon it. And again, just a matter of fundamental fairness, is that if you have an opt-out, which no one knows about, what good is it? Especially in a short class. For example, if the school said, Okay, kids, let's all go off to the local Baptist church and everyone's going to be baptized. Just an example. And then the kid comes home and says, Hey, Mom, today I was baptized. And the mom's like, Huh? And the school says, Well, you know, we have an opt-out. Number one, they didn't know about the opt-out. Number two, this course went so quickly, how was I supposed to act upon it? Was it 80 weeks? It was over a—the actual becoming a Muslim aspect of it was only over three weeks. And Chase's mom found out about it after the fact, and that's when she objected to it. And the school here was aware that people were opposed to it but didn't inform anyone. Plus, the Islam Simulation book itself suggests— Is it an elective school board? I'm sorry? An elective school board? Oh, the school board, I believe, here is elected. Yes. Thank you. But that's all. And we just ask, again, for the relief that we sought in our briefs. Thank you very much. Thank you, counsel. Thank you to both counsel for your argument on this interesting, challenging, and difficult case. The final case on calendar for argument today is Mark Twain St. Joseph Hospital v. Levitt. We'll wait for just a moment so the courtroom can clear. Thank you. All right, counsel. Please approach and proceed. Thank you, Your Honors. Tuck away for the performance of Mark Twain St. Joseph Hospital. Judges, Mark Twain St. Joseph Hospital is what is called, for the period we're talking about, a soul community hospital. What does soul mean? Soul community provider or soul community hospital. I think soul. S-O-L-E. Yes. It means only as defined by regulations. And what that really means is that this is a rural area or an area of strange topography so that it is an important, it is considered to be an important hospital resource for this particular geographic area. By whom is it considered? What is now CMS, Center for Medicare and Medicaid Services. And, of course, there's a whole set of regulations and procedures for an institution to become qualified as a soul community provider, but none of those qualification aspects or procedures are at issue here. What's at issue here is the payment rate. Now, it's not irrelevant, Judge B., that you bring this up because it does tie into the public policy behind the soul community provider exemption from the normal rules of payment. In other words, there's a certain level of economic protection given to the soul community provider with respect to the rates that it can expect to get for its inpatient hospital services to Medicare beneficiaries. But the rates are calculated according to a predetermined scheme. Exactly. Exactly. And that scheme, as it works out, can be somewhat complicated to apply. That's a statement. Yes.  is to make sure that beneficiaries in all geographic areas, even way out in somewhat remote or mountainous circumstances, can get these services as Medicare beneficiaries. That's the justification for the exemption that's in the Social Security Act, which does direct the secretary to make special procedures and exemptions and exceptions to the payment system. And, of course, that's why we're here. And what happened in this case, in short, is that the Provider Reimbursement Review Board decided that if there was what it considered to be an error in setting the rate, that the reopening provision of the regulations, which is Section 405.1885, can be used to reduce the payment to the hospital for each year to which the preset rate applies. Up to three years, though, right? for that particular year. Right. And that is, I think, the central point of disagreement between the parties in this case. I mean, there's an awful lot of detail and a lot of regulations here, but I think that's what it comes down to. Because you're saying that the applicable regulations should have been 412, 71, and 72. Exactly. And that is the regulation portion that sets forth how the sole community hospital rate gets set and adjusted and, in some cases, appealed. And those are, you know, somewhat detailed, of course. But the bottom line on that is that- Let me just see if I understand. We're talking about the difference between reopening a hospital-specific rate under 412, 71, and 72, or reopening cost reports under 405, 1885. Is that- Do I have it right? That's exactly right. Okay. That's exactly right. And that is where the disagreement- So we get to choose which of those regulations govern the adjustment at issue in this case. Is that where we are? I think that's exactly right. Okay. I think that's exactly where you are. And because the board's decision recognizes that under 412, 71, and 72, the changes that we're complaining about could not have been made. And I don't think there is a disagreement. Well, we'll see. But I don't think there's a disagreement from the government on that. I don't believe so. I think that there is a disagreement about whether Section 1885 can be applied year by year as distinguished from it. And this is the slightly, oh, I suppose subtle difference, but it's really not that subtle once you get into it. There is a decision made about the applicable rate in 1994. And that decision- That's a hospital-specific rate. Correct, correct. And that rate is then changed in 1998 by the intermediary for reasons that the record shows are complicated but include the perception by the person who did it in 1998 that it should have been lowered. That's the one where the PERS payment was taken out? Correct, correct. But actually the PERS payment wasn't itself taken out. What was taken out was the termination payment when they came out of PERS. The one time- Because actually what happened is that for a period of time in the base year, they participated in the retirement system, and they spent something like $57,000. The record's a little unclear as to whether it was $53,000 or $57,000, but they spent some money on the system. Then they decided, for reasons of economy or whatever, to terminate their participation in PERS. And then they had to pay $376,000 as termination liability. Right. And when the case was in front of the PRRB, the provider had a pension expert very familiar with PERS and explaining how all of that works and what its rationale is. And how it's designed to even out in the long run what all the participants pay. Before we go further with this, the exclusion of the $376,000, was that ever appealed? The short answer is it was not appealed in the underlying case so far as we can tell. Except that there was an informal discussion of the issue, and we go through this. There was no formal appeal when there was a resolution. Okay, here's what you would have had to appeal, and this is right in the regulation 412.71 and 7.2. You would have to appeal the application of that rate to the year that you're complaining about. Right. And... Was that done? Well, that was done in the years that we're talking about, for 92 and 95. I mean in the year when the base year. So far as we can tell, there is no evidence that it was. But what we explain in the brief is that that really doesn't matter for two reasons, one of them legal and one of them factual. The legal reason is that for any year to which it's applied, you have a separate appeal right as a provider. You do. And if you were to prevail in that appeal for that year, and here we're talking 1994 and 1995, then you get the benefit of the merits of that appeal, but it's not retroactive. Let me ask you this. I was following you until you got to that point. I thought when the HSR was calculated, that's a one-time calculation, and you have a certain period of time to appeal that calculation. Otherwise, you're disagreeing with that? No, no, that's not what the regulation says. What the regulation says is there are certain changes that can be made within 90 days. Right. You can say, oh, I think you made a mistake in arithmetic, or the intermediary can say the same thing. I'm not talking about arithmetic. I'm talking about the decision that this was an extraordinary expense and therefore should be excluded from the base year calculation. Okay. Here's the answer, and it is that you don't have an immediate appeal right  What you do have is a right to appeal when that rate is applied to the next year, and it comes up in your audit. And you make your appeal of that issue for that particular year. But you're not suggesting, are you, that for every single year thereafter, you could appeal that issue? For that year, yes. And now you want to know the authority. Exactly. Okay. And the authority is the Alhambra case. No, no, no. I'm talking about what's the regulatory authority. What's the regulatory authority that would allow you to appeal the HSR every year that that HSR is reflected in your payment? Because you told us there's a complicated scheme. You told us there's a complicated scheme that sets for precisely how the HSR is calculated. Now, I would expect that if that HSR can be challenged, that there would be a specific provision, as it is with everything else, regarding challenging the HSR. So tell me where in the regulatory scheme it is said that you can challenge the HSR every year that you get payment. Okay. It says that you can challenge it in the year to which it is applied. It says that in 4.12.7.1 and 7.2. Right. And then the question of whether the general appeal authority of the PRRB includes review of those issues in the course of each subsequent year's appeal, which is really the question I think you're asking. Exactly. But you're taking me outside the regulatory scheme and taking me to a case that you said allows it. Is that where you're going? Well, yes, it's the board's interpretation of that very issue, and that is the Alhambra case. And it's not the Ninth Circuit Alhambra case. It is... Was this case cited in your brief that you're referring to? Oh, yes, it was. And I had my finger on it just a minute ago because I thought that that might come up. Now, this always happens. I'll get it on my rebuttal, but it's Alhambra. It's a 1993 board case. It's published in CCH. And I don't want to waste time here flipping through my brief when I just had it a minute ago. But basically what it says is that you can raise that issue, but only for that particular year. In other words, it had to do with, oh, you complain about how your base year formula was calculated, but you didn't appeal the base year determination. Nevertheless, you can appeal a subsequent year to which it is applied if you have good ground. But I said when you raised that point, I said there was another reason why that is really not at issue here. And the issue is, of course, that... The reason is, of course, that in 1994, the rate that we're talking about was, in fact, published by the intermediary and applied to the hospital. So, in other words, the hospital got the benefit of that revised rate for some period of time, and it turns out to have been about four years before the intermediary said, oh, you know what I'm going to do now is I'm going to retroactively change it, and I'm going to publish a new rate. There was a period of time when the hospital did not get the benefit, right, get the benefit of that increased rate. Wasn't there a period of time that the hospital did not get the benefit? That's right, yes. And there was a period of time when it did get the benefit, but my question was whether or not during the time that you were not getting the benefit of the increased rate, you were trying to challenge that decision to exclude that $356,000 had expired. That was my question. That's your question and the answer that, as far as we know, we don't have evidence that that was part of the formal appeals for those early years. Do you think that the board decision allows you to nevertheless appeal? Oh, there's no doubt of that. I think there's no doubt of that because there was no challenge to jurisdiction over this appeal before the board. What if the board's position was that you can't bring it up now because you didn't timely appeal the original determination in the first year, then they would have said, well, we have no jurisdiction over the appeal. But you're from the government. But I hope I reserved a little bit for rebuttal here because... Well, that's what I thought. Maybe we should hear from the government and then you can rebut. Oh, okay. Okay. All right. Thank you. May it please the Court. Kirk Sherriff with the U.S. Attorney's Office on behalf of the Secretary of Health and Human Services. The issues in this case are primarily factual findings by the PRRB, the Provider Reimbursement Review Board, that the hospital attempts to... The hospital argues a factual position based on the dissent by one of the two dissenting judges at the board. But the dispute between the judges at the board is primarily a factual one concerning whether the PERS termination liability expense, which is the one-time non-recurring expense that was incurred when the hospital terminated its PERS plan, whether that was excluded in 1984 during the 1984 audit of the 1983 base year costs, whether it was excluded at that time, which is what the majority of the board found, for purposes of rate setting using the 1983 base year costs, or whether that... And the hospital, in the prior argument, essentially acknowledged that there was no appeal of that exclusion from 1984. What the board then found was that in 1993 and 1994, during a settlement process involving unrelated issues in which the base year costs were adjusted, they used the wrong 1983 base year costs. They used the higher costs that had been used for... I mean, the PERS termination liability expense had been allowed as a cost for the hospital's 1983 fiscal year. But what it wasn't allowed for was as a part of setting the base year costs for purposes of... That's correct, Your Honor. The board found that that was an error when the wrong cost structure was used in 1993-94. That was a factual finding, and there's substantial evidence to support that. The dissenting judge disagreed. But that disagreement, as a fact, isn't a legal issue. It's a factual finding by the board. Let me ask you this. The opposing counsel said that it doesn't matter if the hospital did not appeal the hospital's specific rate for the base year because the decision of the board gives them the right to appeal any time that base rate is used in any subsequent years. Do you agree with that? No, I do not. No. No, our position is... And I find that position quite ironic in that it's essentially the reverse of what the hospital's accusing the government of having done in this case, which the government didn't do based on the factual findings of the board. The board found that there had to be finality under sections 4112.71 and 4112.72 by no later than 1987, with respect to this first termination. It's not 4112, it's 412, right? I'm sorry, I misstated. It's 412.71 and 412.72. That's correct. Those provisions, and to the extent that's a legal analysis by the board of its own regulations, I submit it's entitled to some deference. And what those provisions state, though, are in 412.71d, it states that the base year cost cannot be changed after the first cost reporting period beginning after October 1, 1983, except as provided in 412.72. So the first cost reporting period ends up being, I believe, the 1985 cost year. And the 412.72 lays out various procedures for modifying those base year costs. But what we do have in the record, we have the board's finding that there was no appeal acknowledged by the appellant, but we also have the fact that we have the appeal letter from the 1985 year, and that does not contain any appeal of the first exclusion. You said that the difference between minority and majority was basically a factual question, but isn't it a legal question when the board found that the inclusion of the $376,000 termination payment was an error? I mean, why is that a factual question? Because I think it's a... That's a conclusion of law that it was an error, right? I don't think so, Your Honor. It may have some elements of both, but it's primarily factual because you have testimony from the witnesses of the intermediary and of the hospital that the rate had been set, certainly from the intermediary, that the rate had been set in 19... Are you saying it was a computational error? Somebody had lapsus medicine. Literally a computational error in the sense that there are two TACs, target amount compensation sheets. One is for the base year costs used for settlement of that 1983 year, and one is the TAC used for setting the rates, base year costs for purposes of rate setting. And the testimony literally is that they used the wrong sheet. Could you point for me, this is a complicated case for me. Yes, Your Honor. To specific parts of the record that provide substantial evidence in support of the agency's finding of administrative error. That there was an error in 1993-94? Okay. There is the intermediary witness, Hamilton Yeh, I believe is how you say it. He testified that the... What part of the record are you referring to? ...in which he testifies that the wrong TAC was used from 1983. To excerpts, again supplemental excerpts of records, 20, page 20 at lines 10-18, 21 lines 8-11, and 22 lines 1-6, where he testifies that the inclusion of the PERS liability expense in 1993-94 was unintentional and resulted from mistaken use of the wrong cost report. Thank you. I'll also refer the Court to supplemental excerpts of record, page 31, which is a letter from the hospital in which they acknowledge that the 1983 cost report needed to be rerun to exclude the $376,000 PERS non-recurring expense. This is a 1997 letter, I believe, that precipitated or was in connection with what ultimately became the 1998 revised notice of program reimbursement. That was what was curious to me in this case. The hospital pointed out the fact that there had been overpayment. Then why did the hospital challenge it later on, challenge the decision to correct the base rate later on? Well, that's not clear from the record. What we have is the record of the intermediary in the hospital before the PRRB. But what's clear is that they backed away from the statements by, I think it was Mr. Silvera in that letter, and they claim that he didn't have authority to make those statements. Going back to one issue with regard to the ability to appeal and further, I want to just touch on something to further support the Board's legal finding that under 412.71 and 412.72, the time for appeal or the time for modification of the base year cost with respect to the PERS liability was finalized by 1987. The appellant cites to 412.72B1 as providing a potential, I don't really see, it wasn't clearly made, but potentially a means, a mechanism for appealing in any subsequent year in which those base year costs are used to calculate the hospital-specific rate and the repayment for that subsequent year. What that section, I'll submit, says is that the hospital can challenge those base year costs upon receipt of its notice of amount of program reimbursement following the close of its cost reporting period. That cost reporting period under 412.71 was the 1983 base year. They could have appealed it in 1984 or 1985, and ultimately modifications could have been made, but they can't years down the road appeal it just because that rate continues to be used in every payment that is subsequently made to the hospital. Why would a opposing counsel think that Alhambra allows that? I'm not familiar with the board decision in Alhambra, and I'm reviewing the brief that was not cited by either party. That's why I asked that because I didn't see it either. And the Ninth Circuit decision in Alhambra does not address that point. Counsel, if the board goes back and puts in the $376,000 as a cost basis in 1994 and does so until 1998, so long as, and then takes it out in 1998, right, so long as there's an appeal from that decision in 1998 within three years, you'd admit that that would be a timely appeal, right? The board's decision or, well, the intermediary's action in issuing the 1998 notice was properly appealed. But what the board factually found was that in 1994, the intermediary did not change the base year cost. And, in fact, the board found, and the appellant argues, and we agree that they could not have done that under 412.71 or 412.71. That's a computational error. Well, it wasn't just a computational error. It was just a computational error. That's correct. The wrong schedule. They used the wrong schedule. And because of that, the government was foreclosed from recovering for several years. So had they really changed the rate, then it would be an appeal. But since they just made a computational error, there was no rate change. That's correct. That's correct. You know, to the extent that the issue of whether, I don't agree that it's properly an issue, but to the extent that they're arguing that the purse liability exclusion or purse liability amount should not have been excluded in base year costs in 1983, that, I mean, the board also found, as a matter of fact, that it was properly excluded. And there's substantial evidence in the record for that finding as well. There's one other point I would like to address, which is with respect to the reopening under 405.1885. Appellant makes the argument in their brief that that reopening, admittedly can go back three years, but that the error, and I believe this was touched on in the opening argument, the error in this case occurred in 93-94, and that preceded by more than three years the period of time, that preceded by more than three years the October 1998 reopening notice. That is an argument that was not made to the PRB, and I don't believe it was even made to the district court except in the reply brief. We have in the record, well, first, the notices for fiscal years 94 and 95 that were modified, reopened by the 1998 notice, those notices were issued within three years of the 98 notice. They were issued on April 21, 96 for the 94 fiscal year, and August 28, 97 for the 95 fiscal year. And in its brief to the PRB and in its appeal of those notices, of the October 98 notice, excuse me, the hospital challenged the three-year provision under 405.1885 with respect to earlier years, but they never challenged it with respect to the 94 and 95 fiscal years. And the district court correctly found that the PRB couldn't, I submit, couldn't have abused its discretion by not considering an argument that was never made to it. But that point is also, the point argued by the hospital on that issue is also wrong because 405.1885 permits reopening within three years of a determination of an intermediary. Or a notice of the intermediary determination. And that's what those notices from 96 and 97 were with respect to the, they were the notices of program reimbursement for the 94 and 95 years and they're properly reopened within three years. How did the PRB address this issue because it excluded some years from recruitment? They did address the issue with respect to the 92 and 93 years because those were the only years that the hospital raised this argument with respect to. And 92 and 93, for those years, the notice of the program reimbursement were dated more than three years before the October 1998 appeal. So, essentially, one of the intentions of the PRB members would have allowed the reopening of everything on the ground because it's essentially a fraudulent government, but that's not what the majority found, or not what the majority agreed to. I have nothing further. Thank you, counsel. Thank you, Your Honor. Judge Rawlinson, thank you for your patience on that Alhambra citation. It is at page six of our reply brief. It is Alhambra Community Hospital versus Blue Cross Blue Shield. It is a 1993 decision by the HCFA, Healthcare Financing Administration, administrator. As the Court may recall, the administrator has the prerogative to review a board decision and, therefore, the administrator, when he chooses to review a board decision, he makes an authoritative determination of the issue from the agency's standpoint. And that was... that Alhambra case was. But I want to address, specifically, a couple of things that counsel just said about what the board did and about the 1885 argument because what happened is that the board sort of pulled this 1885 argument, I don't want to say out of thin air, but not out of the intermediary's contention because the intermediary admitted at the time of the hearing that 1885 couldn't justify the 1998 reopening. And, in fact, in the board's decision, this is on page 10 of the excerpts of record, it says the intermediary argues that its October 1998 reopening action was not improper even though that action was well past the three-year reopening limit imposed by Section 1885. In other words, the intermediary had a different theory of why it could reopen under 1885, one which the board did not accept. Now, counsel made reference, which I think is very instructive, to the dissenting opinion of the chairman, Chairman Cochran, because I don't think it's correct to say that Ms. Cochran's disagreement was with a factual issue because it was both factual and legal, and she explained that she didn't see the evidence to her that this was a simple error by any means, but that if you accepted that the majority is making a finding of fact on this, that they are still wrong as a matter of law because 1885 can't be used to go back four years to change that 1994 determination. And I would particularly suggest at page 15 of the excerpts of record, that's where Ms. Cochran explains all of this, and most relevant is her footnote, rather lengthy footnote number 21, which is her review of the record of why she said what she said about the disagreement she had. But she says, even assuming those facts established in so far as the applicable regulations are concerned, you cannot use 1885 to override these two regulations that govern the rate setting. And although, you know, here's something. It's often said in these kinds of appeals that the agency gets deference in interpretation of its regulations, but here we don't have anything to support any interpretation other than the decision of the board in this case, because as we've pointed out, and I didn't really see anything in the briefs to the contrary, there is no authority to the contrary which would support the board's decision outside of this very case. And we did cite the Desert Hospital of Las Vegas case, which appears to go exactly the other way in saying that you can't avoid the time limitations of .71 and .72 just by saying that there was an error. Counsel, do you have a copy of the Ann Hambro Community Hospital case? I don't have it in my pocket, Your Honor, but I could certainly submit that, and I can do that to counsel in the court this afternoon or tomorrow morning. Okay, just the case, no arguments. Just the case, no, I understand that. All right. But included in this commentary by the chairman is the citation. This is on page 16, where she says, the regulation at 412.723A explicitly addresses limited circumstances when reopening may be used only to increase the base year rate. That reopening is a reference to Section 1885. We understand your argument, counsel. You've exceeded your time. Okay, thank you. Thank you to both counsel for your argument. The case is submitted, and we are on recess for the day.
judges: D.W. Nelson, Rawlinson, Bea